INDIANAPOLIS HORSE PATROL, INC., A CORPORATION, ET AL.
*v.* WARD.

[No. 20,177. Filed February 23, 1966.]

*Elmon Williams, John G. Tinder* and *Albert W. Ewbank,* of Indianapolis, for appellants.

*Leroy K. New,* of Indianapolis, and *Pogue & Young,* of Franklin, for appellee.

SMITH, P. J.—This is an action instituted by the appellee, Perry B. Ward, against appellants, Indianapolis Horse Patrol, Inc., and certain individuals named as directors of said corporation, and against Cecil Byrne, the chairman of the Shrine Circus, to recover damages for an *alleged conspiracy to defame* the appellee growing out of statements made by certain individual appellants and by their participation in voting to expel and oust the appellee from membership in the Indianapolis Horse Patrol, Inc.

The pertinent facts as evidenced by the record are as follows:

The appellee was a member of the Murat Shrine, a Masonic organization, located in the City of Indianapolis. He became affiliated with and became a member of two uniformed bodies of the Murat Shrine, to-wit: the Gatling Gun Club and the Indianapolis Horse Patrol, Inc. An annual Shrine Circus was sponsored and promoted by the Murat Shrine; and, in connection with the sales of advertising for this circus, the various uniformed bodies, including the Gatling Gun Club and the Indianapolis Horse Patrol, Inc., were entitled to receive twenty per cent of the advertising proceeds realized from the sale of advertising by any of their members. The appellee in the year in question sold advertising for the Shrine Circus. He designated that a certain percentage of the proceeds he realized from the sale of such advertising be credited to the Indianapolis Horse Patrol, Inc., and a certain percentage of such proceeds be credited to the Gatling Gun Club.

Shortly after the appellee had made such designation of proceeds he was expelled and ousted from membership in the Indianapolis Horse Patrol, Inc., by certain of its directors. The appellee *alleges that this ouster was the culmination of a conspiracy to defame him* because he had questioned the disposition of the proceeds realized from the annual Shrine Circus. He further alleges that because of this ouster he was humiliated before the general public and suffered a resulting loss of income.

Trial was had by jury which returned a verdict for the appellee and assessed his damages in the amount of sixty-eight thousand dollars ($68,000.00). Judgment was entered by the court in accordance with the verdict. The appellants moved for a new trial which was overruled by the court and which ruling is the sole assignment of error on appeal.

The appellants allege and contend that the trial court committed seven specific errors. The first error urged is the insufficiency of the evidence to sustain the verdict. Under this heading the appellants have advanced two propositions, the first of which is that there was insufficient evidence to substantiate a finding that there was a *conspiracy to defame and disgrace* appellee Ward engaged in by the appellant Indianapolis Horse Patrol, Inc., the individual appellants as directors thereof, and the appellant Byrne as chairman of the Shrine Circus.

The second proposition urged under this heading is that there was insufficient evidence to support a finding of malice on the part of the appellants either by word, act or deed, acting either individually or in concert, the showing of which, as urged by the appellants, is necessary to overcome the "qualified or conditional privilege" enjoyed by any member of any fraternal organization.

In deciding this assignment of alleged error we first are required to consider the question of whether or not there was sufficient evidence of any nature upon which the jury could

have based their verdict. As this Court and our Supreme Court have repeatedly held an assignment of error that the verdict of the jury is not sustained by sufficient evidence presents to this Court only the responsibility of determining whether or not, giving effect to the evidence most favorable to the appellee and all reasonable inferences which might be drawn therefrom, reasonable minded men could not have arrived at the same decision. *James Lee Bassemier* v. *Paul A. Sartore, Jr. et al.* (1964), 137 Ind. App. 139, 201 N. E. (2d) 285; *Pokraka* v. *Lummus Co.* (1952), 230 Ind. 523, 104 N. E. (2d) 669.

The evidence most favorable to the appellee shows that the appellee had questioned the disposition of the proceeds of the Shrine Circus; that the directors of the Indianapolis Horse Patrol, Inc. held a meeting late at night on March 4, 1959 at which the Secretary of the Horse Patrol, Inc. had not been invited to attend; that appellant Townley called appellant Hunt, briefed him by telephone and recorded Hunt's vote on the question of expelling appellee from membership in the Horse Patrol; that the expulsion was known to be an embarrassment to the appellee; that business damage to the appellee was a factor considered by appellant Townley; that the appellant Nolte knew that humiliation, shame and disgrace could also result if the appellants pursued their plan of expulsion; that the appellant Barth communicated the decision of the other appellants in "language I wouldn't want to repeat here" and expressed the fact that the appellee would thereafter be the only Shriner in America barred from the Horse Patrol premises; that the appellants combined their vote of expulsion even though there was no specific wrong and no charge placed against the appellant; that one appellant called the appellee "a thief;" and that the appellant Barth told the appellee at the time of his dismissal that this expulsion will "hurt you in business, it will ruin your reputation and the rest of your family."

A panel of twelve disinterested jurors heard this evidence

and were in a position to observe the demeanor and determine the credibility of the witnesses. This assignment of error that the verdict of the jury is not sustained by the evidence does not in this case present an issue for our consideration for the reason that the record as related above contains sufficient, substantial, probative evidence to sustain the jury's verdict and it is not within our province to weigh the evidence and substitute our judgment for that of the jury. *See, McKinley, Ex. et al.* v. *Overbay* (1961), 132 Ind. App. 272, 177 N. E. (2d) 389; *Stayner* v. *Nye* (1949), 227 Ind. 231, 85 N. E. (2d) 496.

The second proposition urged under the first assignment of error is that members of a fraternal organization enjoy a "qualified or conditional privilege" which relieves them of any liability for damages resulting from a *conspiracy to defame*, and creates in them a legal immunity for any word, act or deed spoken or done by them. The appellants do, however, concede that a showing of malice would remove them from the cloak of immunity but urge that the trial court erred because there was no evidence to sustain a showing of any malice on the part of the appellants.

In resolving this question, however, we do not deem it necessary to decide whether or not the appellants did or did not enjoy legal immunity given to members of fraternal organizations because there was sufficient evidence, as related above, on which the jury could have concluded that there existed a malicious scheme which was intentional and deliberate in combination to injure and defame the appellee.

The second assignment of error urged by the appellants is that the trial court erred in refusing to give to the jury appellants' requested instructions number 3, 17, 19, 23, 24, 25 and 27, all of which would have instructed the jury that words, which ordinarily uttered might be slanderous, cannot be here considered as such because the communications of the Board of Directors of Indianapolis Horse Patrol, Inc., con-

cerning the *alleged slander and conspiracy to defame were privileged, in the absence of any malice.*

In answering the appellants' contention it first must be stated that the doctrine of qualified or conditional privilege of members of fraternal organizations is directed at excluding evidence during the trial. The appellants however did not advance any such objection when the evidence was submitted to the jury. Therefore, as far as the admissibility of any alleged privileged communications is concerned the appellants expressly waived the error when they did not object to the appellee's offer. *Cox et al. v. Stout, Adm.* (1882), 85 Ind. 422.

The third assignment of error raised by the appellants is that the trial court erred in refusing to give to the jury appellants' tendered instructions number 22 and 32.

Instruction number 22 reads as follows:

"The uncontroverted evidence in this case disclosed that the By-laws of the Horse Patrol provide as follows:

"Article XIII—Any member of the Patrol who is charged with misconduct after hearing by the Board of Directors on such charge find the member guilty, can at their discretion, dismiss such member from membership or, impose such penalty as they deem necessary.

"The plaintiff has alleged in his complaint that the plaintiff herein was not furnished with any formal charge and not furnished with a copy or summary of any resolution or the reasons therefor in regard to his being expelled from the Horse Patrol.

"I instruct you that the By-laws of the Horse Patrol do not provide for the furnishing to plaintiff any written copy of any formal charges or a copy of any summary, any resolution, or the reasons for such resolution, *and therefore whether or not this information was furnished to plaintiff or not would not be a violation of the rules and regulations of the Horse Patrol nor could they be the basis for any claim for damages or the part of a conspiracy as alleged in plaintiff's complaint.*" (Emphasis supplied)

Instruction number 32 reads as follows:

"I instruct you that the By-laws of the Horse Patrol, Inc. provide as follows:

"Sec. 7. Special meetings by the Board of Directors shall be held whenever called by the Secretary upon the direction of the President, or upon written request of any two Directors and it shall be the duty of the Secretary to give sufficient notice of such meetings or by mail or telegraph to enable a director so notified to attend such meeting.

"Sec. 8. Meeting by Consent. Meeting of the Board of Directors may be held at any time or place where all of the Directors are present and consent to the holding of such meeting. So if you find that the Directors of the Horse Patrol, Inc. held a meeting on March 4th or March 7th, 1959, and further find that said meeting was held in conformity and pursuant to the above quoted Sections of the By-laws of the Horse Patrol, Inc., then I instruct you that said meeting was a lawful meeting irregardless of the time and place it was held and the mere fact such meeting was held could not be considered by you as any evidence of any conspiracy to defame the plaintiff on the part of any of the defendants."

The appellants contend that they were entitled to have these two instructions submitted because the jury should have been informed that the articles and by-laws of the Indianapolis Horse Patrol, Inc. did not require that a formal charge be presented to the appellee; that therefore their meeting was legally held and conducted; and subsequently the fact that they held the meeting could not be the basis for an action for a *conspiracy to defame* the appellee. However, we believe that these two instructions were properly refused. In *Cook* v. *The State* (1907), 169 Ind. 430, 82 N. E. 1047, and in *Roberts* v. *State of Indiana* (1919), 188 Ind. 713, 124 N. E. 750, the Supreme Court held that in a cause of action involving a conspiracy direct evidence can seldom be obtained and for that reason it is well settled that a conspiracy may be shown by isolated and independent facts. In *Moore et al.* v. *Shields* (1889), 121 Ind. 267, 23 N. E. 89, the Supreme Court laid down the rule in regard to the admission of evidence attempting to prove a conspiracy, ". . . the field of inquiry is broadened to allow the trial court a wide discretion in the admission of evidence showing the relation the parties to the

conspiracy bear to each other, their interest in the success of the act to be accomplished or in the motive for its formation."

Taking these rules into consideration we cannot say that the trial court was in error in refusing to give these instructions because the jury could properly consider the acts of the appellants as part of an overall attempt to discredit the appellee. The mere fact that the by-laws did not require formal notification of a charge against the appellee does not render their actions free from the jury's consideration. The jury could properly take into account these meetings as a part and parcel of the overall conspiracy. They could have concluded that the failure to notify was intentional and done with malice in light of the fact that the time and place of the meeting occurred late in the evening of March 4, 1959; and no official minutes of such meeting were prepared and kept. A second meeting was held on March 7, 1959 at which meeting there were discussions relative to the possibility of injury to the appellee, his family and to his business reputation all of which tended to show a disposition and concurrence of sentiment in a common purpose which is the gravamen of a conspiracy. These instructions, if given, would have removed from the jury's consideration what the jury by its decision found to be the consummation of the appellants' scheme to defame the appellee merely because the by-laws of their corporation did not provide for notice to the defendant. The jury was properly allowed to consider the appellants' actions at these two meetings and they in fact did find that they were an integral factor of an overall design to defame the appellee.

The appellants next allege that it was error for the trial court to refuse to give appellants' requested instructions number 15 and 29. Instruction 15 reads as follows:

"The plaintiff has alleged in this complaint in Rhetorical Paragraph 9 that in and about the City of Indianapolis in the State of Indiana the general public is aware of the requirements which provides that a member of the Horse

Patrol may be dismissed from membership only upon specific charges duly filed, heard and determined, as aforesaid. I instruct you that as to this paragraph of complaint there has been no evidence introduced by either party as to the knowledge of the general public as alleged in the said paragraph of complaint, and your finding on this paragraph of complaint should be for the defendant."

The appellants assert that there was no evidence to support the allegations in paragraph 9 of the appellee's complaint and it was therefore error to refuse to give this instruction.

However, this error, if any, was waived by the giving of appellants' tendered instruction number 26 which reads as follows:

"The plaintiff has alleged in his complaint in Rhetorical Paragraph 9 that in and about the City of Indianapolis in the State of Indiana the general public is aware of the requirements which provides that a member of the Horse Patrol may be dismissed from membership only upon specific charges duly filed, heard and determined as aforesaid. "I instruct you that as to this paragraph of complaint there has been no evidence introduced by either party as to the knowledge of the general public as alleged in said paragraph of complaint and your finding on this paragraph of complaint should be for the defendant."

It is a well settled rule that it is harmless error to refuse to give a tendered instruction where the substance of such refused instruction is covered by another or other instructions. *Ellis* v. *Haines* (1963), 134 Ind. App. 528, 188 N. E. (2d) 835.

The appellants also assert under assignment number 4 that it was error on the part of the trial court to refuse to give appellants' tendered instruction number 29 which would have withdrawn the issue relative to the alleged slanderous remarks of one Lee Townley from the consideration of the jury. The instruction reads as follows:

"The plaintiff has alleged in rhetorical paragraph 31 of the plaintiff's complaint as follows, to-wit: The said defendants, and each of them combined and acted in furtherance of said

intention to defame the reputation of this plaintiff by causing one of their conspirators, namely, Lee B. Townley, for and on behalf of all other defendants to utter words which imputed dishonesty to plaintiff as the real and undisclosed reason for his expulsion aforesaid, to-wit: That plaintiff 'stole' $1250 worth of business from the Horse Patrol by designating the Gatling Gun Club as the recipient thereof, aforesaid, all of which was heard by plaintiff and others well known to defendants, but not known by plaintiff.

"I instruct you there is no evidence in this case that Lee B. Townley made said remarks or that said remarks were heard by any other person, or in any fashion published, and on this paragraph of complaint your finding should be for the defendants."

However, the evidence discloses that at the meeting of all the appellants on March 7, 1959 Townley said:

". . . you are a thief. You stole business away from the Horse Patrol and tried to give it to the Gun Club."

The appellants further contend, even though the appellant Townley may have accused the appellee of being a "thief" first over the telephone on March 4, 1959 in a conversation with the appellee and then later at the second directors' meeting on March 7, 1959, the appellee still failed to prove that there was any instance of publication outside of the confines of these two meetings and therefore no responsibility for any damage to the appellee's reputation can attach to the appellants.

In answering this contention it first must be said that to sustain an action for a *conspiracy to defame* the defamation must be published, that is it must be uttered in the hearing of some person other than the one defamed. The gist of the action is the unfavorable impression instilled in the mind of a third party by the wrongdoers in using defamatory utterances within earshot of a third party. *Hoeffner* v. *Western Leather Co. et al.* (1942), 161 S. W. (2d) 722.

The record does not support the appellants' contention of non-publication. One Charles Stackhouse testified that he

overheard some of the appellants on the Horse Patrol premises discussing the expulsion of the appellee. Another witness tetified that he "knew there must be something wrong someway" and he didn't "want to get contaminated" so he discontinued his business connection with the appellee after he learned of the appellee's expulsion from the Horse Patrol. A Norman Day testified his severance from appellee's business was "based upon his expulsion from the Horse Patrol."

From this review of the record evidence we must conclude that the jury having observed the witnesses judged their credibility and having heard their testimony had sufficient evidence to sustain their finding that the appellants *had a malicious intent and were acting in concert to defame and injure the appellee and in fact did so.*

The fifth error assigned by the appellants is that the trial court erred in overruling the appellants' motion for a directed verdict at the close of the presentation of the appellee's evidence and presented again at the close of all the evidence. They contend that there was no evidence of a conspiracy nor was there any evidence of malice on the part of the appellants and therefore the trial court was in error in not directing a verdict in favor of the appellants.

As we have previously stated above, the record is replete with substantial, probative evidence that the appellants *acted with a design to defame and injure the appellee.* This evidence was submitted to a jury of twelve disinterested citizens who decided after hearing the evidence that such a conspiracy took place and that as a result the appellee was defamed. As we have stated so often before this appellate tribunal will not undermine a jury's decision by weighing the evidence. That is not our function. The trial court was not in error in failing to direct the verdict.

The sixth assignment of error is that the trial court erred in admitting into the record evidence relative to the disposition of the proceeds of the Shrine Circus. The appellants

allege that the theory of admission into the record evidence of the proceeds of the circus was nothing more than an attempt to discredit the Murat Shrine in the operation of its annual circus, by asserting that the conspiracy was based upon an attempt of the members of the board of directors of the Horse Patrol to cover up the circus operations and that it was for the purpose of prejudicing the minds of the jurors into believing that the Shrine Circus was not a charity, and the appellants knew it, and in order to cover up their acts, dismissed the appellee from membership in order to protect the manner of the distribution of the proceeds. The appellants urge that this evidence which was sought to be introduced was immaterial, irrelevant to any issue raised by the complaint, and reversible error to admit such evidence.

The appellants' main objection to the competency of the evidence showing the manner in which the proceeds of the Shrine Circus were distributed is that such evidence is not germane and material to the issues. However, from an examination of the issues formed by the complaint and the answers thereto, it becomes readily apparent that the appellee in his complaint alleged in substance that the *conspiracy to defame* was the direct result of his challenge to the manner in which the proceeds of the circus were distributed and as such, therefore, the evidence was germane and material to the issues. We do not believe that this contention of the appellants that the evidence was not germane and relevant to the issues has any merit.

In further answer to the appellants' objection that such evidence was not germane to the issues it should be noted that appellee's exhibit number 12 was admitted into the evidence *without objection by the appellants.*[1] Exhibit number 12 was a financial statement of the 1959 and 1960 Shrine Circus containing therein a detailed record of the proceeds of the

NOTE: 1. Exhibit Number 12 was offered by appellee Perry Ward as a part of his direct examination. See pp. 361, 362, 363, 364 and 365 of transcript and was admitted without objection.

Circus. It is a well settled rule of law that an opponent cannot be heard to complain to competency of evidence which was admitted without objection. Dean Wigmore supports this position:

> "The initiative in excluding improper evidence is left entirely to the opponent so far at least as it concerns his right to appeal on that ground to another tribunal. . . . A rule of evidence not invoked is waived." 1 Wigmore Evidence, Section 18, p. 321.

Finally in answering this contention of alleged error it must be noted that the appellants themselves offered testimony that was admitted into evidence concerning the disposition of the Circus proceeds. The appellants' witness, Merlin M. Bailey, an accountant, gave a detailed listing of the charities to which the monies of the Murat Shrine were distributed after which the following question was put to the witness by appellants' attorney:

> "Q. What happens to the profits from the Shrine Circus? Where do these funds go?
> "A. The profits from the Circus are distributed to the uniformed organizations, the Temple. That's it."

It therefore appears that the appellants are requesting this Court to reverse this cause on the strength of evidence which was germane to the issues, admitted without objection and upon similar evidence offered by the complaining parties themselves. Such a contention is without merit.

The final error relied upon by the appellants is that the award of damages by the jury was excessive. The contention is that the jury was motivated by passion and prejudice and a "lack of proper understanding of the case."

In resolving this error we need only repeat the rule so often enunciated by this Court that an award of damages will not be reversed where the award is not so large as to indicate that the jury was motivated by prejudice, partiality or corruption.

*Swallow Coach Lines Inc.* v. *Cosgrove* (1938), 214 Ind. 532, 15 N. E. (2d) 92.

Applying this rule we must state that there was evidence given by the appellee himself that he suffered a loss of income of approximately four thousand dollars ($4,000.00) annually and that all of this loss was attributed to and resulted from his expulsion from the Horse Patrol. In addition there was uncontroverted evidence that the appellee had a life expectancy of 14.40 years.

The jury heard the testimony of the witnesses Heur, Cook and Day who not only admitted that they terminated their connection with the appellee's business as a result of his expulsion from the Horse Patrol, but specifically named others who did likewise.

Finally, the appellee testified that he felt the "chill of being ostracized."

All of these factors were taken into consideration by the jury in their deliberations. Their award in light of all the evidence is not so grossly outrageous as to indicate they were motivated by prejudice or passion.

All evidence and reasonable inferences therefrom must be resolved in favor of the appellee. *Wilson* v. *Rollings* (1938), 214 Ind. 155, 14 N. E. (2d) 905.

In light of the above discussion we, therefore, hold that the judgment was not contrary to law, that it was sustained by sufficient evidence, and that the record fails to disclose any reversible error.

Judgment affirmed.

Carson and Hunter, JJ., concur. Prime, C. J., and Wickens, J., not participating. Dissenting opinion to follow.

MOTE, J.—This is an appeal from a judgment rendered upon a jury verdict in the Johnson Circuit Court. The original complaint was filed in the Marion Circuit Court on December 31, 1959, and was styled as "An Action for Slander

and Malicious Abuse." In the said original complaint, among
other things the plaintiff, appellee herein, charged eight cer-
tificate holding members and directors of the Indianapolis
Horse Patrol, Inc., an adjunct of and wholly separate body
or unit of the Murat Shrine Temple of Indianapolis, Indiana,
with a conspiracy:

"(7) . . . to bring disgrace upon plaintiff, and shame
him, by causing him to be illegally and wrongfully dis-
missed as a member of the Indianapolis Horse Patrol, Inc.,
contrary to the principles of natural justice among men,
by the defendants malicious misuse, and malicious abuse of
the *processes* of the Indianapolis Horse Patrol, Inc. for
dismissal of a member for misconduct, without charges of
misconduct being *madee* or lodged against plaintiff, and
without a trial or hearing upon charges of misconduct made
against plaintiff, and without plaintiff being guilty of mis-
conduct, which processes were then, and *arenow,* in and
under the domination and control of defendants, and so
controlled and dominated as herein appears.

(8) That in furtherance of their conspiracy the defend-
ants did dictate and direct the actions of the Board of Direc-
tors of the Patrol, and by their dominance and number,
the defendants being eight of thirteen members of the
Board of Directors, defendants did carry out their purpose
of dismissing plaintiff from the Patrol as planned by them,
and did bring plaintiff into disgrace, and disrepute, and
did shame him among the membership of the Patrol and
among the Nobles of the Mystic Shrine, and by aggrivation
of such injuries of plaintiff by pretending to members of
the Patrol and Nobles of the Mystic Shrine, to act impar-
tially, and only upon due and thorough consideration of
charges of misconduct, and in the best interest of the In-
dianapolis Horse Patrol, Inc.

(9) That defendants, pursuant to said combination and
conspiracy, acting in concert, without cause therefor, did
unlawfully, and maliciously, by their malicious misuse, and
their malicious abuse, of the powers and authority vested
in them as members of the Board of Directors of the Patrol,
cause action to be taken by the said Board of Directors,
and by themselves, to dismiss, and dismissing plaintiff as
a member of the Patrol; and, did and do deny to plaintiff,
and to his family the right to attend functions, gatherings,
and activities on the grounds and club rooms of the Patrol,
and of all rights of membership, and of the *privileges* and

*courtisies* extended members of the Patrol and Nobles of the Mystic Shrine and their families, much to plaintiff's shame, humiliation and disgrace, and mental suffering.

(10) That the defendants, by their combination and conspiracy, planned and intended, and have injured the plaintiff, in his *reputation and standing* as a man, and, as a Noble of the Mystic Shrine, and, as a *memberz* of the Murat Temple, and, as a member of the Horse Patrol, and did thereby so injure the plaintiff by their said acts in dismissing and causing plaintiff to be dismissed, from membership in said Patrol, by reason whereof plaintiff is in disgrace and disgraced, humiliated and shamed, and caused much mental pain and anguish from which he has, and now suffers, and will continue to suffer *indefinately*.

(11) In furtherance of said plans and intents of defendants as aforesaid, defendants to offer a reason for their actions to members of the Patrol and to Nobles of the Mystic Shrine, and to further injure the plaintiff in his standing and reputation, did falsely and maliciously circulate and cause to be circulated, false and untrue and slanderous reports among the membership of the Patrol and among Nobles of the Mystic Shrine, and to the public, that charges of misconduct had been made and preferred *aginst* plaintiff with the *Borad* of Directors of the patrol, that plaintiff had been duly advised of the charges and given full opportunity to defend himself, that he was given a trial, and tried upon the charges so made by the Board of Directors of the Patrol, and, that the Board of Directors had found plaintiff guilty of the *chrages* of misconduct upon which he was so heard and tried, and found guilty of *miscondut*, and, had been dismissed by the Board of Directors as a member of the Indianapolis Horse Patrol, Inc. on account of, and by reason of said trial and finding of guilty, while in truth and in fact no charges of misconduct were so made against plaintiff, and plaintiff was not tried or given a hearing by the said Board of Directors, which said false and slanderous statements so made, and so circulated, were, and are injurious to plaintiff and have and keep plaintiff under a stigma, and under disgrace and suspicion. That *dfendants* have not and do not, in the circulation or making of said false and slanderous statements, state the misconduct with which plaintiff was charged and for which he was so tried, and so dismissed from membership, but *intentitionally* omit so to do, in order by said omission to imply, and to create, the belief that plaintiff was guilty of great and reprehensible misconduct, too ugly, and too

mean, and too degrading to be mentioned, for which he was dismissed after trial, as before stated.

(12) Plaintiff has been, and is now, and will continue to be injured and damaged by the aforesaid acts and conduct of the defendants, and, has, does, and will continue to suffer great humiliation, anguish, and mental suffering and injury therefrom. That plaintiff has by the slanders and malicious acts of the defendants, become to be held under a cloud of suspicion and disgrace by people generally, and by members and Nobles of the Mystic Shrine in particular, much to his injury and damage in the sum of Three Hundred Twenty-five Thousand Dollars."

To this original complaint the defendants filed an answer of admission, denial and lack of information under Rule 1-3. The plaintiff asked for jury trial and thereafter the cause was venued to the Johnson Circuit Court. On December 6, 1960, plaintiff-appellee, by motion, sought authority to make additional parties defendant and to file an amended complaint, which motion was granted. By such motion Indianapolis Horse Patrol, Inc., a corporation, and Cecil Byrne, an individual, were ordered joined as defendants.

On said December 6, 1960, plaintiff-appellee filed an amended complaint which is in the words and figures following, to-wit:

"Comes now the plaintiff and complains of the defendants and for cause of action alleges and says:

1. That the defendant, Indianapolis Horse Patrol, Inc. hereafter referred to as 'Horse Patrol' is a corporation Not-for-Profit, organized and existing under and by virtue of the laws of the State of Indiana, having its principle place of business located at all times herein mentioned at West 106th St., R. R. 1, Carmel, Hamilton County, Indiana.

2. That the defendants, Lee B. Townley, Richard Hunt, Walter C. Shelton, Michael Barth, Sr., Ferdinand C. Nolte, Walter E. Shelhorn, Lloyd L. Williams and Floyd M. Stoner, were at all times herein mentioned, Directors of the Horse Patrol, acting for and on behalf of said Horse Patrol.

3. That the defendant, Cecil Byrne, was, at all times herein mentioned, acting under the capacity and title of

'Circus Chairman,' the duties of which were, among other things, to coordinate for the Murat Shrine all sales of tickets and advertising by the various uniform units, including the defendant, Horse Patrol, as such advertising and ticket sales pertained to the annual 'Shrine Circus,' more particularly defined hereafter.

4. That at all times herein mentioned, the plaintiff, Perry B. Ward, was and still is a member of the Horse Patrol, and has, at all times mentioned herein, fully complied with all the rules and by-laws of said organization and is now the duly qualified participant by certificate of membership in said non-profit corporation.

5. That said Horse Patrol was chartered and exists for the general purposes of providing facilities for social functions and other gatherings of the members, including plaintiff, their wives, business acquaintances, and guests, including large acreage barns and stables and a club room building all located at the principal place of business aforesaid, such members all being comprised of Nobles of the Mystic Shrine and existing as a so-called 'uniform unit' of the Murat Temple of Indianapolis, Indiana, purporting through the efforts of the members of said Horse Patrol, to advance and promote the fellowship and good will of the members, each with the other and with the brothers of the Murat Temple and the Mystic Shrine.

6. That membership in the Horse Patrol is obtained upon the approval and acceptance of the vote of the membership thereof, and subject to the specific provisions of the by-laws, duly adopted by the Horse Patrol, and the corporation laws of the State of Indiana, dismissal may be occasioned by vote of the Directors of the Horse Patrol upon the condition that grounds therefor are duly established, heard and determined and an appropriate opportunity for reply and defense thereto is granted to the member.

7. That all of the members of the Horse Patrol, including plaintiff, are known and generally reputed throughout the nation as extraordinary men of high caliber, unblemished integrity, charitable nature and exceptional prestige, more especially in and about the City of Indianapolis, and the State of Indiana, the community in which the plaintiff resides.

8. That the by-laws of the Horse Patrol, duly adopted and existing throughout all times herein mentioned, provide that a member thereof may be separated and discharged of membership therefrom as follows:

## ARTICLE XIII

'Section 1. ANY MEMBER OF THE PATROL, WHO IS CHARGED WITH MISCONDUCT, AFTER A HEARING BY THE BOARD OF DIRECTORS ON SUCH CHARGE FIND THE MEMBER GUILTY, CAN AT THEIR DISCRETION, DISMISS SUCH MEMBER FROM THE MEMBERSHIP, OR IMPOSE SUCH PENALTY AS THEY DEEM NECESSARY.'

9. That in and about the City of Indianapolis and the State of Indiana, the general public is aware of the requirements which provides that a member of the Horse Patrol may be dismissed from membership only upon specific charges, duly filed, heard and determined as aforesaid.

10. That at all times herein mentioned, the Board of Directors of the Horse Patrol consisted of 13 members, each of whom, separately and severally were charged with the duties of properly carrying out the provisions of the by-laws for the members and of safeguarding all rights and privileges guaranteed thereunder.

11. That the defendants, Lee B. Townley, Richard Hunt, Walter C. Shelton, Michael Barth, Sr., Ferdinand C. Nolte, Walter E. Shelhorn, Lloyd L. Williams and Floyd M. Stoner, constituting a majority of said Directors, at all times herein mentioned held themselves out to the general public as being duly concerned with the maintenance and continued operation of various hospitals for crippled children about the nation, and in furtherance thereof, aided in the promotion of a certain Shrine Circus, held annually, including the spring of 1959, under the sponsorship and control of Murat Shrine body, under which operation all members and units of the Murat Shrine are given an opportunity to sell tickets and generally stimulate interest and attendance at said Shrine Circus, until such effort, in 1959, became highly competitive between the various groups, organizations and units of the said Murat Shrine to determine who could sell the most tickets for the Circus.

12. That at all times herein mentioned, said 'Shrine Circus' was advanced, publicized and sold to the general public as a charity program, proceeds from which were to financially aid the crippled children's hospitals around the nation.

13. That no one organization and no member was limited in the number of tickets it or he could sell, all funds and proceeds from sales therefor being remitted to the Murat Shrine office, under the supervision and control of the de-

fendant, Cecil Byrne as 'Circus Chairman' and purportedly credited to the respective organization or uniform unit designated by the member making such ticket sales.

14. That certain members of the Horse Patrol, including plaintiff, additionally sold advertising in the circus programs, which were sold at the circus, and as an inducement to the membership to extend their efforts in sales, a percentage of the gross amount of all advertising sold was, at all times mentioned here, credited to the unit of the Murat Shrine designated by the individual solicitor and that as a result thereof the particular uniform unit received the cash equivalent of 20% of the gross advertising sold.

15. That at all times herein mentioned, plaintiff was a member of two recognized uniform units of the Murat Shrine, namely the Gatling Gun Club and the Horse Patrol.

16. That no prohibition has ever existed which would prevent a member of the Horse Patrol, the Murat Shrine or any unit thereof, including this plaintiff, from dividing the credit for the sale of advertising between the various units to which he belongs.

17. That in the course of making such division of business prior to and in conjunction with the 1959 'Shrine Circus' plaintiff assigned and allocated $2500 worth of advertising business to the Horse Patrol and $1250 worth of advertising business to the Gatling Gun Club, such specific designation being made to the defendant Cecil Byrne and was made on the official records of the Murat Shrine, established for that purpose, all with the express knowledge, consent and approval of the officers of the Murat Shrine and more particularly Cecil Byrne.

18. That the defendants, Lee B. Townley, Richard Hunt, Walter C. Shelton, Michael Barth, Sr., Ferdinand C. Nolte, Walter E. Shelhorn, Lloyd L. Williams and Floyd M. Stoner, learned of the separation and division of credits concerning this plaintiff's sales of circus program advertising, aforesaid on the same day that plaintiff made such entry upon the official Murat Shrine records, said defendants and each of them met at a late hour of the night at the Horse Patrol club rooms, in the absence of plaintiff, pursuant to no call, notice or waiver of notice and resolved then and there that plaintiff should be ejected from membership in the Horse Patrol, and did thereupon, in furtherance of said 'resolution' tendered a check in the sum of $136.00, drawn on the funds of the Horse Patrol on deposit, averring to plaintiff that such sum purported to be a return

of his dues to the Horse Patrol for 1959, which sum was refused and rejected by plaintiff.

19. That thereafter, the defendant, Lee B. Townley, acting in concert with the other defendants, went to the official records aforesaid and erased plaintiff's designation of $1250 worth of advertising sales to Gatling Gun Club and entered such item to the credit of the Horse Patrol, said records then and there being under the direct control and supervision of defendant Cecil Byrne, and such alteration was done with the knowledge and consent of said Cecil Byrne and the other defendants.

20. That thereupon, the defendant, Cecil Byrne, acting in furtherance of the alteration of records committed by the other defendants, did give all of such advertising sales to the credit of the Horse Patrol, contrary to the express written designation of plaintiff aforesaid.

21. That the defendant, Cecil Byrne, conspired and acted in concert with the other defendants by falsely announcing to the members of the Murat Shrine, including plaintiff's brother members in the Horse Patrol, that the 'Circus Committee' had ruled that all designations made by solicitors in 1959 would necessarily bind the solicitors to the same designation in 1960 thereby holding plaintiff up to shame and ridicule among his brother Shriners by inferring and suggesting that he violated a rule or regulation by dividing his business and sales between his two units aforesaid.

22. That said attempted dismissal of plaintiff from the Horse Patrol was in violation of the by-laws thereof.

23. That said meeting of the Board of Directors at which the so-called dismissal resolution was passed in violation of the by-laws of the Horse Patrol by virtue of the fact that such meeting was without notice or waiver of notice to the Directors and proceeded to determine and resolve that plaintiff should be ejected from membership without according plaintiff a hearing, a formal charge, and without a copy or summary of the resolution or the reasons therefor being provided the plaintiff or the membership of the Horse Patrol.

24. That such resolution aforesaid was *ult(r)a vires*, unlawful and of no force and effect and such action, *pro se*, constituted a direct defamation which prejudiced and injured the reputation of plaintiff in his profession and business and impeached plaintiff's integrity before the brother Nobles of the Mystic Shrine as well as in the neighborhood

in which he lived and worked because of the inference and suggested impression that plaintiff had been duly charged with misconduct, tried and found guilty of some infraction of the rules, all of which was false, untrue and malicious, and known to be false and malicious and defamatory by the defendants and each of them.

25. That thereafter and in the furtherance of said conspiracy to defame as aforesaid, the defendant, Walter E. Shelhorn, being then Treasurer of the Horse Patrol, as well as a director, in the Murat Temple during the latter part of July, 1959, and in the presence and within the hearing of other officers of the Horse Patrol, the Potentate of the Shrine and other members of the official divan, all well known to the defendants but all of whom are not to the plaintiff, and the said defendant, Shelhorn, acting for and on behalf of the other defendants and the Horse Patrol did then and there name plaintiff as a 'blackmailer' who was not entitled to a hearing.

26. That thereafter the official divan of the Shrine directed the defendants and each of them to correct said unlawful resolution of expulsion of this plaintiff and defendants refused, choosing instead to orally call plaintiff to appear before these defendants, purporting to be assembled officially as directors of the Horse Patrol at the Horse Patrol Club Rooms, at which time and place plaintiff appeared and sought from the defendants, individually and collectively an explanation of their action aforesaid seeking to expel him from membership illegally, whereupon defendants informed plaintiff that his so-called dismissal would stand without explanation, but that if plaintiff would then voluntarily resign from the Horse Patrol, he plaintiff, would be saved the disgrace, the embarrassment and injury which he otherwise would sustain as a result of his dismissal before the brother Nobles of the Mystic Shrine and the community in which he lived.

27. That plaintiff then and there formally objected to defendants concerning his denial by them of his right to be specifically charged with misconduct, as provided by the by-laws aforesaid and plaintiff refused to resign.

28. That in furtherance of defendant's conspiracy to defame and injure the reputation of plaintiff, defendants ordered plaintiff to permanently remove himself from the Horse Patrol premises, including the club rooms, and defendants further forbade plaintiff to bring any member of his family or any guest or business acquaintance to the

Horse Patrol premises and denied plaintiff all further benefits, rights and privileges of membership in the Horse Patrol, despite the fact that plaintiff's dues were then and there fully paid up and accepted by the Horse Patrol and all moneys due for plaintiff's membership therein had been long since paid in full.

29. That plaintiff then and there called the said illegal resolution of expulsion and denial of privileges to the official divan, a governing board of the Murat Shrine, seeking redress and correction of such wrong to plaintiff, but said appeal for relief by plaintiff was rejected by the Divan.

30. That defendants and each of them conspired and combined against plaintiff among themselves and each with the other, acting in concert, pursuant to which the above and foregoing acts were carried out, all with the intent and purpose of bringing humiliation, disgrace and shame upon plaintiff before the members of the Horse Patrol, his neighbors and business acquaintances and the Nobles of the Mystic Shrine.

31. That said defendants, and each of them, combined in furtherance of said intention to defame the reputation of this plaintiff by causing one of their conspirators, namely Lee B. Townley, for and on behalf of all other defendants, to utter words which imputed dishonest to plaintiff as the real and undisclosed reason for his expulsion, to-wit: that plaintiff 'stole' $1250 worth of business from the Horse Patrol by designating the Gatling Gun Club as the recipient thereof, aforesaid, all of which was heard by plaintiff and others well known to defendants, but not known by plaintiff.

32. That defendants in furtherance of such conspiracy to defame announced publicly to the members of the Horse Patrol that they had duly passed such a resolution of expulsion denying plaintiff his membership therein, all for the purpose of degrading plaintiff, such defendants and each of them knowing among themselves that such resolution was done maliciously and unlawfully and was not the just and proper consequence of any charge, hearing or trial as provided in the by-laws.

33. That plaintiff has no adequate remedy or recourse to relieve himself of the shame, disgrace and humiliation which has been brought about by the combined actions of the defendants acting on behalf of the Horse Patrol improperly except by money damages.

34. Plaintiff has been, is now and will continue to be injured, damaged and caused mental anguish and shame, all in addition to loss of business directly resulting from such malicious acts of the defendants, all of which has caused plaintiff damage in his business and profession in the sum of Three Hundred and Twenty-five Thousand Dollars ($325,000.00).

Wherefore plaintiff sues defendants and each of them separately and severally and prays for judgment in the sum of Three Hundred Twenty-five Thousand Dollars ($325,-000.00) and for all other proper relief in the premises."

To this amended complaint all of the defendants, appellants herein, filed a motion to strike certain parts of the amended complaint, which was overruled and, under the circumstances, does not warrant further comment.

Thereafter defendants Cecil Byrne, Indianapolis Horse Patrol, Inc., Lee B. Townley and Walter B. Shelhorn, filed a separate demurrer to said plaintiff's amended complaint, on the ground that said amended complaint did not state facts sufficient to constitute a cause of action against said defendants. This demurrer was supported by extensive memoranda. Defendant Lee B. Townley also filed a separate demurrer supported by memorandum. Indianapolis Horse Patrol, Inc. filed a demurrer supported by memorandum. All demurrers were overruled after briefs submitted by appellant addressed to the various demurrers and we will make no further remarks relative thereto.

The defendants answered the amended complaint under Rule 1-3.

Plaintiff made application for production of books and records of Shrine Circus, by defendant Cecil Byrne, and the court ordered that the audits of 1958 and 1959 of the Shrine Circus operations should be furnished to plaintiff, appellee, for his examination and inspection. An application by all defendants was filed, asking for the production of state and federal income tax statements and all books and records of

Perry B. Ward for the years 1958 to 1962, inclusive, which application was granted.

There was an application by the defendants for a change of venue from Johnson County, which was overruled, and thereafter the case was submitted to a Johnson County jury for trial which resulted in a verdict and judgment in favor of appellee and against appellants in the sum of Sixty-eight Thousand ($68,000.00) Dollars.

Appellants assign as error of the trial court and argue the following:

"No. I. Verdict not sustained by sufficient evidence and contrary to law.

No. II. Court erred in failing to give defendants tendered instructions on qualified privilege.

No. III. Court erred in failing to give defendants' tendered instructions relating to By-laws.

No. IV. The court erred in failing to give defendants' tendered instructions relating to withdrawal of certain allegations of complaint.

No. V. Error in failing to direct verdict.

No. VI. Error in admission of evidence concerning distribution of proceeds of circus.

No. VII. Excessiveness of verdict."

Analyzing the amended complaint and the evidence to sustain the various allegations, we conclude that rhetorical Paragraphs 1 to 7, both inclusive, in their nature and character are introductory. Rhetorical Paragraph 8 which sets out Article XIII of the By-laws of the Horse Patrol, is complete, and the attempt by rhetorical Paragraph 9 to allege its legal effect and how it becomes operative is of no avail; neither is the statement of the alleged awareness of the general public concerning the contents and effect of said Article XIII any more than an attempt to plead an unwarranted conclusion which is not supported by the evidence. Rhetorical Paragraph 10 does not appear to be inimical but we must remark that the latter part of the one statement contained

therein is a legal conclusion which is not supported by evidence.

Rhetorical Paragraph 11 does no harm and provides no help to either party, except that it does lay the ground work or basis of competition between the various groups or units attached to, but not necessarily a part of, the Shrine Temple. It fairly may be said that such competition constituted the real basis of the litigation here before us; and, as appellee was aware of the sharp competition (rivalry) involved and the commissions to be provided for the sale of advertising, it seems inappropriate that he should complain of the unfortunate circumstance which resulted, as the record discloses, from his own act in knowingly and intentionally violating the *modus operandi* by attempting to divert sales credits belonging to the Horse Patrol, (Exhibit 9), to another "unit" to which such credits did not belong, when, as he knew, they previously had been assigned, in accordance with the long established custom or rule of the organization, to said Horse Patrol for its exclusive property, subject to divestment only if sales were not made by a certain date. Nor does it seem logically just to affirm that, as the record shows he did, he could by-pass the regularly appointed Circus Chairman of the Horse Patrol, to whom all members of the latter were to report and with whom their activities were coordinated, and then complain of the direct result of his own failure to comply with the universally accepted rules of that body.

The evidence sustains the allegation in rhetorical Paragraph 12 of the amended complaint. The evidence establishes that the Shrine Circuses were advanced as a charity program and proceeds therefrom were used to aid the Crippled Childrens' Hospitals. But appellee errs in concluding and contending that all of the proceeds exclusively were to be used for such purpose, because his own evidence, as stated in another place in this opinion, evinces, without doubt, that the funds derived from the circus operations were duly designated to be used for (1) *Temple activities,* (2) local and state

charities, *and* (3) Crippled Children's Hospitals. (See: Plaintiff's Exhibits 7 and 8 set forth at the conclusion of this opinion.)

We find no evidence in the record tending to support the last clause of rhetorical Paragraph 13 of said amended complaint. The record does reveal that defendant Byrne was the General Circus Chairman; that the defendant Lee B. Townley was Circus Chairman for the Horse Patrol; and that reports were to be made to the latter, and not to the General Circus Chairman Byrne, concerning the said Horse Patrol, and the activities and sales by its members of the business assigned to it. The record here does not present a situation in which appellee sold business other than that which belonged to the Horse Patrol, and which business he, consequently, could assign or not assign credit to another "unit."

While rhetorical Paragraphs 14 and 15 of the amended complaint are acceptable allegations of the amended complaint, the significant parts thereof are not sustained by the evidence. The allegation in rhetorical Paragraph 16 of the amended complaint lacks support in the evidence. As noted above, the evidence establishes that appellee could sell and assign credit to any unit he selected *only in the event* that such business had not been previously earmarked or tabbed for "unit" credit, which latter occurrence would preclude him from authentically doing that which he assumed to do.

As to rhetorical Paragraph 17 of said amended complaint, we are faced with the fact that the evidence fails to support appellee's allegation that he, individually, "with the express knowledge, consent and approval of the officers of the Murat Shrine and more particularly Cecil Byrne" (the General Circus Chairman) had the right to divide or divert the business from the Horse Patrol to the Gun Club, inasmuch as such asserted right was subject to the vested property right therein of the said Horse Patrol.

It seems requisite to now remark upon rhetorical Para-

graphs 18 to 24, both inclusive, of the amended complaint, the purport thereof and the evidence, or lack of the same, as revealed by the record, to support the allegations in said paragraphs. The evidence upon the whole record reveals that some or all of the defendants originally named in this action, had become aware of the so-called division or diversion of sales credits belonging to the Horse Patrol on March 4, 1959, and that at least one of the said defendants, in fact, may have caused appellee's purported division or diversion of such sales to have been corrected, thus to reflect what should have been done in the first place; and that in the evening of said date some of the directors met informally and reached the general agreement that the appellee should be divested of membership in the Horse Patrol because of his misconduct in diverting sales from said Horse Patrol to another "unit." Whether this implied complete membership or only as a certificate member is not made apparent, but this absence of clarity is not of vital essence. It appears that there was a directive issued to refund the $100.00 theretofore paid by appellee on his certificate membership in the Horse Patrol, wherein appellee had recently entered as a proposed certificate member, and he had paid but $100.00 of the $400.00 required for complete certificate membership. In any event there was sent to appellee a check for $136.00 which obviously included his $36.00 annual dues and the $100.00 theretofore paid on his certificate membership. It stands without doubt upon the record that those who may have participated in seeking to correct the assignment by appellee did so within the forum and the usages thereto attending. Nor, in our opinion, does the record evince that the defendant, Cecil Byrne, committed any act other than to accede in the first instance to appellee's said direction, and, in the second instance, to accede to the demand of the Horse Patrol that the division of sales or credits be assigned according to rules and custom, namely, to the credit of the Horse Patrol. Appellee was without authority, according to the record, to do that which he had already attempted to do,

since he was then working under the supervision and control of the Horse Patrol Circus Chairman, Lee B. Townley, to whom appellee was to make his report.

There is an absence of evidence to support the allegation that appellee had the right, by written designation or otherwise, to assign or divert the credits belonging to the Horse Patrol to any "unit." Moreover, the record affords nothing to support the urged conclusion that the defendant Byrne, General Circus Chairman, did other than his duty in acceding to the designation of credit to the Horse Patrol after the matter was called to his attention, or in deciding and announcing that the 1959 allocations would be followed in connection with the future 1960 Circus. Appellee's self assumed position that by reason of the announced adherence to the 1959 allocations, he was thereby held up to shame and ridicule among his brother Shriners by their inferring and suggesting that he violated a rule or regulation by dividing his business and sales between the two units, has no legal effect under the circumstances herein related and certainly does not in any way indicate any action contributing to a conspiracy between any of the defendants. There is no showing, as we have analyzed the record, which indicates or which authorizes a legitimate conclusion, that appellee was dismissed from the Horse Patrol by action violative of the By-laws of that organization, and particularly Article XIII thereof. The actual disciplinary action occurred on March 7, 1959, in a meeting of the directors of appellant Horse Patrol, duly assembled by adoption of an appropriate resolution. (See appellee's Exhibits No. 5 and No. 6, infra.) Appellee was present at said meeting and he was charged with the misconduct of attempting to divide or divert sales credits belonging to said Horse Patrol to another unit, which said other unit did not own or control or have anything to do with said business.

The record compels the conclusion that at the meeting on March 7, 1959, appellee was accorded every privilege, notice,

or charge that the By-laws of the Horse Patrol and Section XIII thereof accorded to every member, including appellee.

The term "misconduct" has been defined as "wrong or improper conduct, bad behavior; an instance of bad behavior," and a synonym therefor is "misbehavior." In the Synonym Finder by J. I. Rodale and Edward J. Fluck, synonyms given for the verb "misconduct" include "misapply," "misdirect," "fumble," "botch," "make a mess of," "blunder," "muff," "put one's foot in it," "act foolishly," "err," "do amiss," "offend," "take a wrong course" and "misbehave oneself." We do not believe that the definition of the verb form of the word "misconduct" is any different than the noun form.

That such definitions and synonyms are correct, are not now open to doubt. However, we are inclined to regard the term "misconduct," as applied to the factual situation in the case at bar, as having the significance accorded. Beyond doubt, these appellants, particularly these appellants against whom the charge herein is made, had the right, in the absence of any evidence of a particular definitive application jointly adopted by them, to individually construe, interpret, and accord such meaning to the term "misconduct" as they deemed proper. Neither the By-laws nor said Article XIII defines the term "misconduct." Under all the facts and circumstances as revealed by the evidence the appellants, we believe, had the right to find and decide that appellee was, in fact, guilty of misconduct in the sense individually appealing to them, and that they had the right to discipline appellee accordingly.

The record is devoid of any substantial evidence that the resolution adopted at the called meeting on March 7, 1959, to which appellee was called and had an opportunity to defend his action, was *ultra vires*, unlawful and of no force and effect; nor do we find evidence to support the conclusion that the adoption of such resolution, or relieving the appellee from his membership in the Horse Patrol, constituted a direct, or even an indirect, defamation of the appellee. There was no estab-

lished requirement for a trial, only a hearing which, as we have said, was duly held; and there appears no effort on the part of appellants to create any impression whatsoever in the mind of the general public. So far as appellants are concerned, the record is to the effect that they apprised no one outside of the precincts of privilege even that appellee had been discharged from membership, let alone that he had been discharged for any particular reason whatsoever. It is natural, of course, that appellee should contend that this affirmatively occurred, but there appears no evidence in support of this charge, except the testimony of appellee himself, which named no one outside the precinct of privilege, and which we consider, under the circumstances, to be self-serving and of no probative value, particularly when considered in light of other record evidence which he himself produced. The testimony of witnesses, Charles Stackhouse, a member of the Horse Patrol, Norman Day, M. G. Heuer and Mildred Cook, in our opinion, does not sustain appellee's contention, that some kind of unfavorable remarks were uttered by any of appellants, with the intention, as alleged conspirators, to instill unfavorable impressions of appellee in the minds of others or "within earshot of a third party."

As to rhetorical Paragraph 25 of the amended complaint, if it fairly may be said that the evidence establishes that the defendant, Walter E. Shelhorn, in the presence and within the hearing of "other officers of the Horse Patrol," the Potentate of the Shrine and other members of the official Divan, did then and there name appellee as a "blackmailer" who was not entitled to a hearing, it would have no legal significance in furtherance of the charged conspiracy, because what was said, under the conditions and circumstances divulged by the evidence, was not slanderous or dafamatory, especially when considered in context, how it was applied and the place where it was stated.

As to rhetorical Paragraph 26 of said amended complaint, we must assume that appellee refers to his efforts to prevail

upon the official Divan to correct the action at the meeting of March 4, 1959, which appellee termed unlawful, because appellee's efforts were exerted by him prior to the meeting of March 7, 1959. In the first place, the official Divan had no authority to do anything in regard to reinstatement. In the second place, as we hold and as the record reveals, the action of March 4th was rescinded. Third, appellee attended the meeting of March 7th and, fourth, the record reveals that said appellee was explicitly informed as to why his membership was being lifted. Of course one of the members of the official body of the Horse Patrol officers and directors said privately to the appellee that he could resign and thereby save himself disgrace, embarrassment or injury and, failing to do so, his membership would be lifted. This does not afford an inference of anything other than that the appellants to whom this situation may have been applicable had in mind only the idea to protect appellee from any adverse effects which might result from dismissal. And relative to the allegations of rhetorical Paragraph 27 of said amended complaint, we find nothing in the record nor in the By-laws or Article XIII which require any charges of infraction of the rules to be more specific than those shown by the evidence to have been furnished to said appellee.

Paragraph 28 of said amended complaint, which concerns appellee's denial of further benefits and use of the premises, does not appear to be germane to the issue of an alleged conspiracy by appellants, but refers to the situation and condition consequent upon loss of membership.

In relation to Paragraph 29 of the amended complaint, as stated above, the fact that appellee requested the official Divan to intervene in the matter, which request, we believe, was made prior to the meeting on March 7, 1959, if, in fact, request was made, and which was rejected by the said Divan, would add nothing to appellee's charge of conspiracy and any proof thereof would be of no assistance to appellee because, as we have said, the said Divan had no authority to comply

with said request. Further, as we have previously mentioned, the Divan and the said General Circus Chairman Byrne had no authority, insofar as the evidence shows, to credit the business of the Horse Patrol which had been assigned to it and sold by appellee, to the credit of any other organization or body than the said Horse Patrol. In addition, pertinent to the present subject, we are compelled to observe the patent circumstance that it was wholly inconsistent for appellee to assert that he had no information concerning the charges against him and, at the same time, also to assert that he attempted to get the Divan and Chairman Byrne to intervene concerning them.

As to the other allegations of plaintiff's amended complaint, extensive comment thereon seems uncalled for. They consist, in the main, of irrelevant conclusions, unsupported by the evidence, and appear to be merely at random assertions of a conjured up conspiracy on the part of appellants which, to say the least, rest heavily in imagination. Perhaps, according to the evidence, as appellee suggested in his testimony, these appellants may have had a right to regard him as a "heel," (affording to that often used term its commonly accepted meaning of being a part of the lower extremity of the body known as the foot), and appellee, in using the expression, apparently implied that these appellants did regard him as "low-down" for having done that which he had no right to do, to-wit: assign or divert business belonging to the Horse Patrol to another unit which had no ownership thereof. Whether the aforesaid appraisal is appropriate may be conjectural but it does provide food for thought induced by the realization that appellee, himself, employed the term.

Commenting further regarding the allegation of the amended complaint and the record evidence, we have presented to us in this appeal an anomolous situation which must be quite unique in the annals of American jurisprudence. By his amended complaint, rhetorical Paragraph 4, appellee alleged: "That at all times herein mentioned, the plaintiff, Perry B.

Ward, was and still is a member of the Horse Patrol, (one of the defendants and appellants) . . . and is now the duly qualified participant by certificate of membership in said non-profit corporation" (the said Horse Patrol).

It must be assumed from the next above quoted allegation of the amended complaint that appellee regards the oral decision by certain members of the Board of Directors of defendant, Horse Patrol, on March 4, 1959, and the forwarding of a check to plaintiff thereafter of One Hundred Thirty-six ($136.00) Dollars, as well as the resolution duly adopted by the said Board of Directors on March 7, 1959, as ineffective to deprive him of his membership and assumed status in said Horse Patrol. This being true, appellee must be regarded, by the gist of the amended complaint, as assuming two positions which are diametrically opposed to each other. It seems that the correct assumption is that the steps taken by the directors of the Horse Patrol were effective and, if this assumption is true, then said appellee, in fact and in law, was relieved of his membership in the said Horse Patrol.

With this assumption, we think this Court's inquiry should primarily be directed to the proposition of whether appellee lawfully was relieved of such membership. Even though the proceedings, as revealed by the record, may be lacking in the formality which appellee desired, said proceedings, in our opinion, were such that one of common and reasonable understanding, (with which we presume appellee would desire this Court to accord him), could only infer therefrom that appellee knew exactly why he was being disciplined under Section XIII of the By-laws of the organization.

On direct inquiry from the bench during the oral argument, appellee's counsel was unable to state or indicate an approximate time or date of the inception or formulation of the alleged common law conspiracy by the appellants to defame and injure his reputation and business, as he now refers to the same. Such inability aroused our curiosity. And when we discovered from the record that it could not possibly have

occurred prior to March 4, 1959, we then began to examine the record for the purpose of ascertaining whether it was on March 4, 1959, or March 7, 1959, or thereafter.

It is clear that the transactions at the meetings on March 4th and March 7th, first, were in the precincts of privilege; and, second, in context, the statements made thereat were neither slanderous *per se* nor actionable, and the fact that the amended complaint, filed on December 6, 1960, appears to allege, according to appellee's contention, another and different cause of action than the original complaint, necessitated our search of and inquiry into the matter concerning the change in the gist of the action as portrayed by the original and amended complaints. From the latter it appears that appellee seemingly concluded that the examination of the 1959 and 1960 certified audits of the Shrine Circus operations could be interpreted and utilized in aid of his apparent disgruntled invective that, namely: the said annual circuses were no more than a hoax on the Temple, Shriners and the Shrine generally, as well as those who purchased advertising for the programs, the ticket purchasers, him personally, and the general public. And this, notwithstanding the fact that neither the Temple nor its officers were named as defendants in this action. Furthermore, it is apparent from the record that neither the Temple nor its officers had any control over the Horse Patrol, its officers and directors.

Apart from naming Cecil Byrne, Circus Chairman, and Indianapolis Horse Patrol, Inc., as additional parties defendant, we have been unable to ascertain or assign any logical and legitimate reason for or purpose of the amended complaint other than the veiled indication by appellee that he assumed there was something wrong or mysterious about the disposition of the funds derived from the circuses when he asked defendant Byrne, Circus Chairman for many years, about it in February 1958, who answered that the annual audits of the circus operation were available to him in the office at any time he wished to examine the same. After ap-

pellee made the examination of said audits, in May 1960, he evidently was impelled to change the gist of the action theretofore filed, as shown by the original complaint, to the gist which charged all defendants, as appellee asserts, with the common law tort of conspiracy to defame, etc.

Neither the original complaint nor the amended complaint appears to have been drawn with that degree of exactitude warranting any deduction other than an indisposition on the part of appellee to take a firm position as to the nature of the cause itself, or to inform the defendants, with certainty, the gravamen of the offense they would be required to defend.

As above stated, appellants present for our consideration certain alleged error of the trial court in the overruling of their motion for new trial; and their assignment of errors in this Court, and their briefs are sufficient to present some of the alleged errors.

In view of our own decision to reverse, we do not deem it necessary specifically to answer in detail all of the appellants' asserted errors, even though we adhere to the view that there are various asserted errors which may be well and properly sustained.

We find in the record no substantial evidence of probative value to sustain the verdict and resulting judgment of the trial court. The legal import of the evidence is wholly lacking in support of the essential, elemental factors necessary for the establishment of the common law tort of conspiracy by all or some of the defendants to defame and injure the reputation and business of appellee. To the contrary, all the pertinent substantial evidence shows without reasonable doubt, we think, that on March 7, 1959, with due notice to and charge against appellee, and hearing held, all in pursuance of Article XIII of the By-laws, the purport of which fully was known to appelee in the ordinary course and nature of the business involved, the latter, by appropriate resolution, was dropped from membership in appellant Horse Patrol, as was the es-

tablished right of the Board to do consequent upon appellee's admitted diversion of business from its customer list to another "unit," contrary to the accepted and long adhered to rule and understanding that the Horse Patrol was, under the circumstances, entitled to the credit. Appellee's own exhibits, to-wit: Exhibits 5, 6 and 9, demonstrate the correctness of these assertions. Exhibit No. 5 is as follows:

### "SPECIAL CALLED BOARD MEETING, WED. MAR. 4th, 1959

No minutes were turned in to your Secretary for this meeting as he was not called to attend.

### SPECIAL CALLED BOARD MEETING, SAT. MAR. 7, 1959

Special called Board meeting was held at the Club House, Saturday, Mar. 7th 3:00 P.M. with the following Officers and Board members present: Frazier, Townley, Heffner, Rose, Shelhorn, Stoner, Williams, Shelton, Toombs, Barth, McCarrel and Nolte.

Motion made and seconded that the action taken at the last special called Board meeting be recinded. Carried. Ward was called to plead his own case.

Motion made by Shelhorn and seconded by Toombs that in light with the charges brought against Perry Ward of 'Actions unbecoming a member that he be requested to resign and if he does not choose to do so that his membership be lifted. The vote was 9 to 3.

As no other business brought before the group the meeting was adjourned."

The By-laws of appellant Horse Patrol are set forth in Exhibit No. 6, and Article XIII, set forth verbatim in the amended complaint, allows and permits the Board of Directors of the Indianapolis Horse Patrol, Inc., a not-for-profit Indiana corporation, to discharge appellee from membership therefrom and therein in the manner and methods shown by the evidence. Said Article XIII is as follows:

"ARTICLE XIII

Section 1. Any member of the Patrol who is charged with misconduct, after a hearing by the Board of Directors on such charge, find the member guilty, can, at their discretion, dismiss such member from the membership, or impose such penalty as they deem necessary."

The evidence reveals no defect in the procedure prescribed and followed. Moreover, the fact that there were dissents in the voting on the resolution of expulsion, and the further fact that this was a fraternal and social body, and adjunct to, but not necessarily a part of, Murat Temple, wherein actions taken and determinations made are privileged and are not published, lends, we think, strength to our stated conclusion. We may say, also, that the record evidence does not establish that the Murat Shrine Temple and the Horse Patrol are Masonic organizations. In fact, the record supports just the opposite fact, that neither said Temple nor the Horse Patrol is an organization or unit of the Masonic Order.

There is, also, no evidence even to suggest that any of the appellants, separately or severally, in concert or otherwise, based their votes on the resolution of expulsion on any ground other than that which each separately considered proper. One of the directors, as an example, voted against the resolution because he thought there might be a better way to handle the matter.

Appellee asserted at the trial, without corroboration, that between the meetings of March 4 and March 7, he attempted, without final success, to induce the Shrine Temple officers to intervene relative to the alleged action taken against him on March 4; and, therefore, his contention at the trial, and in this appeal, (although he was requested to be present at the meeting on March 4 and, in fact, did attend the meeting on March 7), that he had no knowledge of the charge against him, is so contrary to the firmly established factual situation as to render such contention unsubstantiated.

And even though appellee called three witnesses who testi-

fied, in effect, that they had heard about the expulsion and ceased their memberships in appellee's Business Mens' Association because of fear of contamination, whatever that term implies, the record is wholly silent that such testimony by said witnesses was in any way derived from appellants, or any of them.

As we construe the evidence in the record, the veiled threat of appellee to decry his assumed position that the money derived from the circus operations did not go to the Crippled Children's Hospital as, in his opinion, it was so advertised and held out to the public, does not provide a basis for such alleged conspiracy, namely because:

(1) None of said appellants had control over the distribution of the funds, and (2), the record exemplifies that the said funds in fact were distributed in exact accordance with the manner advertised and as held out to the public, as shown by the evidence introduced, by appellee himself, thus completely negating appellee's assertions. There appears no evidence of anything to hide or "cover up;" hence, the manner of distribution of the funds could offer no legitimate cause, reason or ground for conspiracy among any of the appellants.

Exhibit No. 9, likewise introduced into the evidence by appellee, discloses that advertising accounts that were assigned to appellant Horse Patrol were in fact sold by appellee, who then attempted to divert part of the funds derived therefrom to another "unit" of which appellee recently had become a member, in contravention of the purpose and aim of the Horse Patrol, long established and within appellee's knowledge. (See Exhibit B.) Neither he, the appellant Circus Chairman, the Temple, its officers, nor anyone else had the right to divert such funds to another's credit, and appellee's assertion that he had the right to do so, or that the Circus Chairman, the Temple or its officers, together or separately, had that right so to do, is completely without evidential foundation. Appellee, as a member of the Horse Patrol, was serving under the direction and control of its, the Horse

Patrol's, own Circus Chairman to whom the reports were to be made. (See Exhibit B at the conclusion of this opinion.) Instead, as the record stands, appellee obviously took it upon himself to do as he chose with the business belonging to the Horse Patrol, without consulting the Horse Patrol, and particularly the said Circus Chairman of the Horse Patrol. And appellee's statement that he cleared the arrangement and diversion of credit of advertising sales belonging to said Horse Patrol with the General Circus Chairman Byrne and officers of the Temple fails to overcome the unretracted and unchanged documented direction to the contrary. Even so, there was no authority vested in those with whom appellee may have tried to clear it to give such asserted approval.

The record herein reveals that appellee had been a member of the Shrine since about 1947, and a non-certificate member of the Horse Patrol since 1956, and in about 1958 he was nominated as a certificate holding member thereof; however, he had paid, on March 4, 1959, but $100.00 of the $400.00 certificate membership fee required in order to become a full fledged certificate member. The record further reveals that he had been specially honored in 1956, 1957 and in 1958 for the excellence of his endeavors in the sale of tickets and in the sale of advertising in the Circus Programs, which brought not only approbation and honor, but income to the said Horse Patrol, and his contribution to the success of the annual Shrine Circuses appears to have been appreciated and rather widely acclaimed by those responsible for such success. Appellee's efforts and contributions for such success doubtless merited the honors and recognition bestowed upon him. The other "unit," in which he quite recently had acquired membership, and to which he attempted, as we have said, without any authority whatsoever, to divert the credit due the Horse Patrol of funds derived from his sales of advertising for the 1959 Circus Program, was not a unit entitled to share in the business which belonged to the Horse Patrol; and, when this was called to his attention, apparently on

March 4, 1959, he egotistically persisted in his self-determined right to credit as he saw fit, and thus brought upon himself dismissal from membership in said Horse Patrol under the provisions of said Section XIII of its By-laws.

In arriving at our conclusions we do not, of course, weigh the evidence. We but survey the evidence in the record and, in doing so, it is wholly apparent to us that there is a lack of vital links in the chain of circumstances depicted by the evidence, as a result of which the judgment cannot stand.

We are not without cognizance of the extant legal principle that conspiracy may be proved by inference from the circumstances and facts revealed by the evidence, and that the general rule of preponderant proof is greatly relaxed in the type of case now under consideration. But we do not understand this legal principle to imply that courts of appellate jurisdiction may sanction and approve verdicts and judgments of our lower courts which are not supported by competent substantial evidence of probative value on the primary and essential facts from which legitimate inferences properly may be drawn. This position appears to be supported by the general tenor and sense of our Supreme Court in *A. S. C. Corporation* v. *First National Bank, etc.* (1960), 241 Ind. 19, 167 N. E. 2d 460, although admittedly the decision is predicated upon inverse reasoning.

The reversal by this Court, with apparent approval of our Supreme Court in its denial of transfer in *Security Trust Company, et al* v. *O'Hair* (1936), 103 Ind. App. 56, 197 N. E. 694, indicates to us that "[I]t cannot be said that he (appellee) was injured in law" because "he gambled and lost" when he himself introduced evidence which negates and, in fact, destroys his own theory of the action sanctioned in the trial proceedings but which do not meet the test when considered on appeal.

The case of *Hamilton, et al.* v. *Cooley* (1933), 99 Ind. App. 1, 184 N. E. 568, (Rehearing denied; Transfer denied) comes

about as close to presenting the law here involved as any other
we have been able to find. Judgment for the plaintiff below
was reversed by a majority decision and opinion and there
was a dissenting opinion. While the factual situation therein
was not comparable to the case at bar, the authorities cited
and pertinent remarks made with respect to the proof of
essential elements command respect. Citing *Karges Furni-
ture Company* v. *Amalgamated, etc., Union* (1905), 165 Ind.
421, 424, 75 N. E. 877, 2 L. R. A. (N. S.) 788, 6 Ann. Cas.
829:

> ". . . A conspiracy is defined to be 'a combination of two
> or more persons, by some concerted action, to accomplish
> some criminal or unlawful purpose; or to accomplish some
> purpose, not in itself criminal or unlawful, by criminal or
> unlawful means.' . . . ,"

and in *Kandis et al.* v. *Pusch et al.* (1927), 86 Ind. App. 246,
250, 155 N. E. 618, it is stated:

> ". . . Before concerted action can amount to a conspiracy,
> creating liability, either civil or criminal, such action must
> be unlawful. . . ."

The trial court gave appellants' tendered Instruction No.
26 which reads as follows:

> *"No. 26.* The plaintiff has alleged in his complaint in
> Rhetorical paragraph 9 that in and about the City of Indi-
> anapolis in the State of Indiana the general public is aware
> of the requirements which provides that a member of the
> Horse Patrol may be dismissed from membership only
> upon specific charges duly filed, heard and determined as
> aforesaid.
>
> I instruct you that as to this paragraph of complaint
> there has been no evidence introduced by either party as to
> the knowledge of the general public as alleged in said para-
> graph of complaint and your findings on this paragraph of
> complaint should be for the defendant."

By this instruction it was correctly assumed by the trial
court that there was no evidence to the effect that "in and

about the City of Indianapolis in the State of Indiana the general public" was "aware of the requirements which provides that a member of the Horse Patrol may be dismissed from membership only upon specific charges duly filed, heard and determined aforesaid." It follows that the lack of evidence in support of such specification in his complaint results in another missing link in proof of an allegation in the amended complaint and in relation to the essential and necessary proof to sustain the judgment.

Much of the record and argument herein are devoted to the proposition concerning the distribution of the funds derived from the Circus operations. As stated above, there is nothing to support appellee's contentions and assertions that the said funds were distributed in any way other than in the manner advertised according to the documentary evidence which appellee himself introduced, and confirmed by the certified annual audits of Circus financial operations.

In the trial of this cause the record shows that the trial court wavered on the admission of oral testimony over the objections of appellants, concerning the said distribution of said funds, but upon the urging of appellee the same was permitted to go into the record. Instead of relying upon their objections and such error as may have been committed thereby, said appellants presented in evidence the said undisputed certified audits which disclose that the said funds were, in fact, distributed in accordance with the announced and well advertised aims and intentions.

It seems to us that the evidence in regard to these matters not only entirely negates appellee's assertions in support of his claim of conspiracy and the alleged reasons therefor, but also unequivocally and positively demonstrate that appellee's position is completely untenable insofar as proof of another link in the vital chain of events as shown by all the evidence. This amounts, we think, to a complete breakdown in appellee's cause of action.

It seems fair and reasonable to observe that the record manifests such trial tactics adopted and pursued by appellee during the course of the trial as to indicate an effort to becloud the issues and evidence so as to confuse the jury and the trial court, and subtly appeal to emotional bias and prejudice. The resulting unconscionable judgment of Sixty-eight Thousand ($68,000.00) Dollars is a self-evident demonstration of the accuracy of our stated observation. If the magnitude of the judgment were the only issue before this Court, the sparsity and inconclusiveness of evidence of any real damage to appellee would demand disapproval thereof.

Based upon the evidence, or lack of the same, we also reach the conclusion that there is no substantial proof or inferences that appellants did anything to circulate or publicize, within or without the privileged precincts, the actions which they took in respect to appellee's membership in the Horse Patrol.

Again, as stated in *Hamilton* v. *Cooley, supra,* "We think this (the) evidence falls far short of sustaining the theory of appellee's complaint, and that the verdict is not sustained by sufficient evidence." This is because, as a matter of law, the verdict and judgment, upon the record, cannot be sustained.

The authorities cited in the Dissenting Opinion in *Hamilton* v. *Cooley, supra,* do not, in our opinion, do violence to the conclusion herein reached since we, in fact, rely upon them to the extent of their applicability. To hold otherwise would open wide the doors for the successful charge of conspiracy and damages in our churches, church organizations, lodges, fraternal and social bodies, by any one who may think himself offended. And it would be not only absolutely unsafe but unwise for any one in authority to meet with others and help decide whether another has violated a rule, principle or tenet of any organization. This would be tantamount to allowing a minority, or a single person for that matter, disposed to do so, as here, to exercise dominant and overriding power over the well intentioned majority. Our society is not based upon such conception.

According to the case law, a conspiracy may be established by evidence of occurrences or by a chain of events which permit the inference of conspiracy. This is the method employed herein by appellee in an attempt to establish the tort of common law conspiracy.

Because of the ease in such establishment, we reaffirm the view that our courts must examine closely the occurrences and chain of events which permit such inference, and hold to a hard and fast rule of strict requirements for exacting evidence and proof that the alleged conspirators have in fact acted in concert with the intention of accomplishing an unlawful purpose or a purpose by unlawful means and if, as here, there is no substantial evidence that appellants did anything more than what they conceived to be their lawful duty under the circumstances then apparent, and according to the rules and regulations of the organization, that a conspiracy was in fact entered into by them, there certainly is a total want of proof.

Many authorities on the question of civil conspiracy have been cited and quoted from by the parties to this appeal. Moreover, arguments from various angles have been presented in the briefs. Largely, however, they tend to show and announce the generally accepted legal principles which concern the formation of a conspiracy, how it may be proved by inferences, etc. These authorities are not in conflict with another legal principle quite as well accepted and which has more pertinence in this appeal. In this latter respect, we express the view that when the evidence in the cause now before us is applied to the law, or if the controlling legal doctrines and principles now extant in Indiana are applied to the plain, unadulterated, pure and refined evidence in the cause, it is affirmatively demonstrated that appellee failed to make a case by the evidence adduced at the trial.

Quoting from *Miller, etc.* v. *Ortman, etc., et al.* (1956), 235 Ind. 641, p. 669, 136 N. E. 2d 17:

"In the Grimm case, *supra,* (*Grimm* v. *Baumgart* [1951], 121 Ind. App. 626, 632, 96 N. E. 2d 915, 97 N. E. 2d 871) the Appellate Court correctly stated the rule that 'There is no civil action for conspiracy, but rather the action is for damages caused by acts committed pursuant to a formed conspiracy rather than by the conspiracy itself. . . .' In other words, if the acts committed were lawful there could be no . . . liability in damages because of a conspiracy to effect these lawful acts. . . .''

Again it is stated at page 670:

". . . In other words, the gravamen of appellant's complaint is a conspiracy to maliciously destroy appellant's separate business as 'Midwest' through a series of acts which appellees had no right to do. Therefore, the *Grimm* and the *International Shoe* cases, supra, (*International Shoe Company* v. *Lacy* [1944], 114 Ind. App. 641, 53 N. E. 2d 636) in which only lawful acts were committed, are distinguishable from and offer no precedent for a decision in this case, wherein unlawful acts are involved."

We are impressed with the legal principle thus announced. There is an entire lack of evidence in this cause to support any charge of unlawful acts on the part of any of the appellants in voting to sever appellee's membership in the appellant, Horse Patrol. Appellee's further membership therein was contingent upon the favorable application of the provisions of Article XIII of the corporate By-laws; and, in view of the undisputed evidence that he reasonably and properly could be, and in fact was, under the procedure prescribed in said Article XIII, found guilty of misconduct by reason of his unauthorized attempt improperly to divert advertising sales credit from appellant Horse Patrol, together with the further undisputed fact that he was required, but failed, to make his reports to appellant Chairman of the Horse Patrol Circus Activities Committee, the severance of his membership cannot properly be said to be unlawful.[1]

---

[1] Excerpts of certain additional written documents admitted in evidence as exhibits will follow this opinion.

Whether appellants have appropriately presented error in connection with their motions for a directed verdict, both at the close of appellee's evidence and at the conclusion of all the evidence, may be open to some question. But in view of our considered conviction that the verdict is not sustained by sufficient evidence and is contrary to law, we need not further consider said error of refusal to direct a verdict.

There is much to be desired in the instructions of the trial court to the jury. Appellants have presented many significant, substantial objections to particular instructions, either given or refused. We entertain the opinion, based upon what we have stated above, that in fact and in law the jury was erroneously instructed. Consequently, it is without much surprise that a large verdict resulted, and we may here iterate that we think the evidence and the law fails to support any verdict for appellee.

As to the question presented by the trial court's refusal to give appellants' Instruction No. 29, absent any evidence of the publication of what was said by Lee B. Townley, as we have heretofore pointed out, we think appellants' said instruction properly should have been given, thus to permit the jury to deliberate upon another hard fact.

The witness, Charles Stackhouse, did not testify that he overheard the remarks of dishonesty attributed by appellee to Lee B. Townley. Nor does the evidence point to, name, or designate any witness who testified that he heard Lee B. Townley make the offensive statement or remark alleged by appellee, in rhetorical Paragraph 31 of his amended complaint, to have been made by said Lee B. Townley. The truth is that there is in the record no evidence by anybody or person outside the confines of the directors' meeting that such remark or statement was ever made by said Lee B. Townley to or in the hearing of such person. And this points up the weakness of this case. Simply stated, the record herein is replete with conjecture, supposition and unproven allegations which have

been accepted and relied upon until now as establishing the alleged conspiracy and damage to appellee.

As to the admission of evidence tendered by appellants in respect to the distribution of Circus funds, that is, the certified audits, we express the view that this Exhibit, demonstrating without any doubt that the said funds were distributed according to the published intent, further discloses that appellee's assertion of conspiracy among appellants, allegedly in order to prevent something that did not occur, disproves appellee's contention that the evidence shows a conspiracy.

What has been and now is appellee's contention? Why that, by the adoption of the resolution (Exhibit 5, *supra*) at a duly assembled meeting, on March 7, 1959, of the appellant Directors of the Horse Patrol in pursuance of Article XIII of the By-laws, *supra,* as alleged in appellee's amended complaint, said appellants unlawfully expelled appellee from membership, thereby defaming and damaging him; and to accomplish this appellants formed a conspiracy for the reason that they wanted to "cover up" an alleged unlawful and amoral distribution of Circus funds. These are appellee's basic contentions, even though, as we have before stated, appellants (1) had no control over the said distribution, and (2) said funds in fact were distributed as advertised and publicized.

Appellee's entire case was predicated upon a wrong premise. The evidence categorically establishes that appellants did not act unlawfully; that appellee was severed from membership in appellant Horse Patrol on the ground of misconduct, pursuant to the provisions of Article XIII of the corporate By-laws; that his misconduct consisted of his admitted attempt to divert sales credits away from the Horse Patrol, all of which may have been avoided had he followed the regulations by reporting his intention to the Horse Patrol Circus Chairman, without reliance upon a "clearance" from those not concerned, if in fact he did get such clearance; that there was

no publication by appellants of what occurred at either the meeting on March 4 or March 7, 1959; that there was no knowledge among the general public as to Article XIII or any other part of the By-laws of the Horse Patrol, as alleged in the amended complaint; and there is no evidence that appellants combined for concerted action to accomplish a criminal or unlawful purpose or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means. *Karges Furniture Company* v. *Amalgamated, etc. Union, supra.* Perhaps any and all of the above reasons were vital and necessary in the establishment of appellee's right to damages as a result of the alleged performance by appellants of unlawful acts through a conspiracy.

I would reverse the trial court.

Bierly, J., concurs. Faulconer, J., concurs in result.

## EXHIBITS

Exhibit B is letter addressed to all Horse Patrol members, the significant portions of which are as follow:

"Paragraph 2. 'Last year, we of the Horse Patrol adopted a team sales approach, the $500-$1000 Club, and what is more important, the slogan is We not I and this spirit made it possible for the performance we attained.'

"Paragraph 3. 'An analysis reveals that *fifty* of our membership made it possible for us to sell $11,613.50 because they devoted a little time asking their fellow citizens for ads, banners or the purchase of UPC tickets for the underprivileged children of Hamilton and Boone County. We have these sales to call upon on an exclusive basis until February 12, 1956. All of these cards are in the hands of the members who sold the accounts last year and they will all be contacted before February 12, 1956.'

"(Paragraph 5). 'This year we have twenty teams with *all* members assigned to a team. We also have four Captains who are co-chairmen responsible for four other captains. The co-Chairmen are Mike Barth, Nick Toombs, Lee E. Frazier and Walter Shelton. Turn all of your sales reports into your respective team captain, who in turn will

turn in the reports to his co-Chairman or myself. Call your Captain and be on the Horse Patrol team this year.' "

This exhibit reveals its composition of the names of various teams and members assigned thereto. Team No. 7 shows David Deuper, Captain, with members Al Edwards, Ora Arnold, Jr., John C. Deller, Fred R. Hawkins, Michael A. Lebraice, Ceril S. Ober, Robert E. Sexson, Nile E. Todd, *Perry B. Ward,* and L. Souders.

(Above emphasis supplied.)

From plaintiff's Exhibit 7—

On the front of the Circus Program, plaintiff's Exhibit 7, we find this language:

"The entire proceeds from the sale of this program will be donated to *Shriner's Hospitals* for crippled children.

Price twenty-five cents"

On the inside page 1 of said exhibit 7:

"(Picture of George L. Stalker, Potentate)

Greetings

George L. Stalker

Potentate

We, of Murat Temple feel that it is a great privilege and trust that we are permitted to bring to the great city of Indianapolis each year the Shrine Circus. We constantly strive to improve each performance, that we may provide the kind of clean and refined entertainment to which all are entitled.

Murat Temple is grateful to you, the citizens of Indianapolis, who so generally support our effort. We especially wish to thank the advertisers in this program and feel that they deserve our patronage.

Our circus, as you know, is our principal fund raising project that helps to support our many local state char-

ities—Shrine Activities and Shrine Hospitals, the most important of these being our 17 Shriners' Hospitals for Crippled Children. Through these hospitals, more than 250,000 underprivileged children have been given a chance to lead a useful and happy life.

So let's be kids again, relax, enjoy the Circus and we'll see you next year.

Sincerely,

/s/ George L. Stalker
Potentate "

From plaintiff's Exhibit 8:

*"Special Notice to All Nobles*

Once a year your Temple sponsors a great Shrine Circus to raise money for Shrine Activities as well as for local and state charities. You as a member are sincerely asked to either sell or buy this book of tickets valued *at $18.00* for which you pay $15.50.

If you buy the coupons and do not want to use them for yourself, remember that you can forward the unused paid-for coupons back to the Circus Office, 339 E. North St., Indianapolis, and your fellow Nobles will BRING UNDERPRIVILEGED KIDDIES TO THE CIRCUS (FREE) AS YOUR GUESTS."

(The above is on cover of book of tickets.)

NOTE.—Reported in 217 N. E. 2d 598.